UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In Re:

BMI SMART PARKING LOTS, LLC      Case No.: 6:25-bk-04004-GER
                                                                    Chapter 11

              Debtor.                          *Subchapter V Election*

_____

**OBJECTION TO CONFIRMATION OF SUBCHAPTER V PLAN OF REORGANIZATION FOR BMI SMART PARKING LOTS, LLC**

Seminole and Patch, LLC, Seminole and Patch II, LLC, and Harbor RDC Storage, LLC (collectively "Landlord"), by and through the undersigned counsel, hereby object to the confirmation of the *Subchapter V Plan of Reorganization for BMI Smart Parking Lots, LLC* (Doc. No. 44) (the "Plan"). The Bankruptcy Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, 11 U.S.C. §§ 1191. This Objection has been filed in accordance with the provisions of 11 U.S.C. §1191 and Fed. R. Bankr. P. 3018, and 3020. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L) and (O).

*Background*

On or about August 8, 2024, Landlord and Debtor entered into that certain *Commercial Real Estate Lease* for the leasing of real property known as 6302 Seminole Avenue, Orlando, FL 32822 and 5282 Patch Road, Orlando, FL 32822 (the "Premises"). On or about January 24, 2025, Landlord and Debtor entered into that certain *First Amendment to Commercial Real Estate Lease* (together referred to herein as the "Lease"). Additionally, in connection with the above-referenced lease amendment, and as an exhibit thereto, to cure Debtor's defaults under the Lease, Debtor executed and delivered to Landlord that certain *Promissory Note* dated January 24, 2025, in the

1

original amount of $204,950.03 (the "Note"). The Note specifies that "Tenant acknowledges and agrees that Tenant failed to pay, and that Tenant owes, Landlord Rent and other amounts owed under the Lease, in the aggregate amount of $204,950.03." *Note*, §2. The Lease and the Note are cross-defaulted. See *First Amendment to Commercial Real Estate Lease*, §4; *Note*, §6(C).

Prior to the filing of the instant Petition, Debtor (again) was in default under the Lease and Note. As a result, Landlord sought to evict Debtor in that certain proceeding styled *Seminole and Patch LLC, et al. v. BMI Smart Parking Lots LLC*, Orange County, Florida, County Court, Case No.: 25-CC-011808-O (the "Eviction Lawsuit"). The Eviction Lawsuit resulted in a *Final Judgment of Eviction* and two *Writs of Possession*. The Writs of Possession, however, were never effectuated as a result of this bankruptcy case, filed on June 27, 2025 (the "Petition Date").

As of the Petition Date, Debtor owed the sum of $213,314.00 under the Lease and the additional sum of $214,642.21 under the Note, for a total of $427,956.21. Debtor has also failed to pay July, August, and September Rent, each of which is due and owing in the amounts of $82,369.00 (for both July and August) and $90,071.37 (for September), each less the sum of $16,400.00 paid by a sub-tenant, for an additional net amount of $213,846.27. Thus, Debtor currently owes Landlord over $600,000.

## Confirmation under Subchapter V

11 U.S.C. § 1191 provides that a Subchapter V Plan may be confirmed only if it: (i) complies with 11 U.S.C. § 1129(a) other than paragraph (15); or (ii) complies with 11 U.S.C. § 1129(a) other than paragraphs (8), (10), and (15) and "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Here, the Plan cannot be confirmed as it does not comply with 11 U.S.C. §§ 1129(a)(3) and 1129(a)(11), and the proposed assumption of the Lease cannot satisfy 11 U.S.C. § 365(b)(1). Each of these issues is addressed below.

**Bad Faith – 11 U.S.C. § 1129(a)(3)**

Initially, a plan may only be confirmed if the Debtor proves that the "plan has been proposed in good faith…" 11 U.S.C. § 1129(a)(3). With respect to good faith, the focus of the Court's inquiry is the plan itself." *Epic Metals Corp. v. Condec, Inc.*, 232 B.R. 806, 808 (M.D. Fla. 1999). As referenced in the *Verified Motion of Seminole and Patch, LLC, Seminole and Patch II, LLC, and Harbor RDC Storage, LLC, for Order Granting Relief from Automatic Stay, or in the Alternative, Adequate Protection* [Doc No. 34], this case, including the Plan, appears to have been filed in bad faith to predominantly disadvantage Landlord.

The timing of the filing of this case (immediately following entry of the Writs of Possession) and the lack of other creditors demonstrate that Debtor's financial problems involve essentially a dispute between Debtor and Landlord, which has already been resolved in the Eviction Lawsuit by the entry of a final judgment and could otherwise be addressed in state court via a damages lawsuit. Indeed, Debtor's own Schedules [Doc. No. 32] indicate that Debtor has: (a) *no* secured creditors; (b) *no* priority creditors; (c) nonpriority unsecured claims totaling less than $12,000 excluding debts to Landlord and its principal, Mr. Pourrain; (d) *no* litigation with anyone other than Landlord; and (e) *no* executory contracts or unexpired leases other than the Lease. "Generally, the courts do not condone the use of Chapter 11 to resolve two-party disputes in the bankruptcy court when such litigation is still pending in a non-bankruptcy forum prior to the commencement of the case." *In re Serfass*, 325 B.R. 901 (Bankr. M.D. Fla. 2005); *In re Lezdey*, 332 B.R. 217, 222 (Bankr. M.D. Fla. 2005) ("The lack of a meaningful number of unsecured creditors in relation to the indebtedness owed to one major creditor is also a factor in deciding whether the Chapter 11 case was filed in bad faith.")

The timing of Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of Landlord to enforce its rights. Given this timing, and lack of any other reason for filing

3

bankruptcy, it is apparent that the Petition was filed solely to stop Landlord from retaking possession of the Premises. Indeed, the Chapter 11 Case Management Summary [Doc. No. 7] discusses no financial difficulty of Debtor or reason for filing other than to prevent Landlord from lawfully prosecuting its action in state court to retake possession of the Premises. As a result, Debtor has been able to maintain possession of the leased premises for an additional three months without making any payment to Landlord.

In short, there was no reason to file this case other than "for the purpose of delaying and frustrating the efforts of" Landlord. *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988). Accordingly, the Plan cannot be confirmed as it does not comply with 11 U.S.C. § 1129(a)(3).

### Lack of Feasibility - 11 U.S.C. § 1129(a)(11)

Section 1129(a)(11) of the Bankruptcy Code states that the Plan may only be confirmed if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." The feasibility standard is whether the plan offers a reasonable assurance of success. *In re DiMaria,* 202 B.R. 634, 639 (Bankr. S.D. Fla. 1996). Based on the Debtor's own financial statements, projections, and operating history thus far during this case, the Plan is not feasible.

*(a)    Material Defaults under the Lease*

Initially, § 365(d)(3) of the Bankruptcy Code, requires the Debtor to "timely perform all the obligations of the debtor… arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected…" In this Court's *Order on Verified Motion of Seminole and Patch, LLC, Seminole and Patch II, LLC, and Harbor RDC Storage, LLC for Order Granting Relief from Automatic Stay, or in the Alternative, Adequate*

4

*Protection* [Doc. No. 51], it required that "Debtor BMI Smart Parking Lots LLC ("Debtor") shall pay post-petition rent as follows: (a) the rent due for the months of July and August 2025 (less any payments by the subtenant received by Landlord) shall be paid by Debtor to Landlord on or before **August 29, 2025**; and (b) rent for the month of September 2025 (less any payments by the subtenant received by Landlord) shall be paid by Debtor to Landlord on or before **September 16, 2025**" (emphasis in original). However, Debtor has paid no Rent whatsoever during this case, even after being ordered to do so. *See Declaration of Non-Compliance Regarding Adequate Protection* [Doc. No. 55].

While Debtor has also suggested it has claims against Landlord (which are disputed), even if true, those claims do not excuse Debtor's failure to pay rent when due. Article 3.1 of the Lease provides that rent is to be paid "without any set-off, deduction, abatement, or counterclaim." Similarly, Article 25 of the Lease provides that "Tenant shall not be entitled to any set-off, offset or abatement of any Rent due Landlord hereunder if Landlord fails to perform its obligations…" Finally, Article 16.2 of the Lease provides that "This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent…" These provisions are consistent with long-standing Florida law. *See, e.g.*, *Masser v. London Operating Co.*, 145 So. 79, 83 (Fla. 1932). Therefore, while Debtor is free to pursue any potential claims it believes it has against Landlord (which Landlord disputes), the potentiality of those claims cannot excuse Debtor's non-payment of rent.

Additionally, Debtor has caused Orange County, Florida, Code Enforcement violations as indicated in a *Statement of Violation and Notice of Hearing*. Based on Landlord's review, these violations relate not just to improper parking, but also unpermitted sheds and storage structures constructed by Debtor on the property which will have to be demolished (and will need further

5

0304020\210114\15298835v3

permits to demolish). The cost of compliance is not yet known. These violations constitute further breaches of the Lease, which requires Debtor, *inter alia*, to "at all times causes its… use and operations at the Premises to be in compliance with all Laws" (Lease, Art. 5), to obtain Landlord's prior written approval for all "alterations, additions or improvements to the Premises or any part thereof ('**Alterations**')" (Lease, §6.1), to construct any such Alterations "in accordance with the requirements of all applicable Laws…" (Lease, §6.5), to comply with all Laws, broadly defined as inclusive of municipal codes (Lease, §9.1), and to bear the cost of such compliance (Lease, §9.2).

Accordingly, the Debtor has failed to perform under the Lease and to otherwise comply with § 365(d)(3) since the filing of its Bankruptcy Petition. Despite Debtor's default and failure to perform under the Lease, Debtor remains in possession of the Leased Premises to the detriment of Landlord, who wishes to relet the Leased Premises and to mitigate its damages under the Lease.

### (a) *Inability to Assume the Lease*

The Plan is predicated on Debtor assuming the Lease, as it is imperative to its business. *See Plan*, Article II. To assume the Lease, however, §365 requires the Debtor to cure all existing defaults under the Lease. The Debtor's own financial statements [Doc. No. 23; 52], show an inability to assume the Lease. The Debtor's balance sheet shows total assets of less than $50,000, with cash on hand of less than $1,000. The July Monthly Operating Report [Doc. No. 52] shows just $2,253.99 cash on hand. As noted above, administrative rent alone is $213,846.27. These filings provide no evidence that the Debtor can provide adequate assurance of future performance under the Lease. Instead, it seems inevitable that if assumed, the Debtor will only default again (for the third time). *See, e.g., In re JLS Shamus, Inc.*, 179 B.R. 294, 297 (Bankr. M.D. Fla. 1995) ("considering the totality of the picture, including the payment history and operating history, this record fails to furnish persuasive evidence that the Debtor is able to promptly cure the default.").

Moreover, the Plan inappropriately treats Landlord's Note claim as a separate unsecured debt to be treated as a part of Class 1 rather than a necessary component of Debtor's cure obligations under §365. Here, as expressly acknowledged by the Debtor, the sums due under Note are nothing more than unpaid Rent under the Lease, which would be entirely due and payable (and therefore would be required to be paid at assumption) but for the *First Amendment to Commercial Real Estate Lease*. That amendment would not have been entered into without the Note, which was executed contemporaneously therewith. In such circumstances, when the two agreements are economically interdependent, bankruptcy courts require that both be cured. *See*, *e.g.*, *In re IT Group, Inc.*, 350 B.R. 166, 179–80 (Bankr. D. Del. 2006), to wit:

> The "critical feature" of decisions which do not invalidate cross-default provisions is "that the agreements linked by a cross-default clause were *economically interdependent:* the consideration for one agreement supported the other." *United Air Lines,* 346 B.R. at 470 (emphasis added), *citing* \*180 *Lifemark Hosps., Inc. v. Liljeberg Enters. (In re Liljeberg Enters.),* 304 F.3d 410, 445 (5th Cir.2002) (upholding cross-default provision in one agreement where non-enforcement "would collapse the [other] agreement" and "thwart [non-debtor party's] bargain in agreeing to enter into the [other] agreement"); *Kopel,* 232 B.R. at 67 (enforcing cross-default clause in lease and collateral note where they were "contemporaneously executed as necessary elements of the same transaction, such that there would have been no transaction without each of the other agreements").

*See also*, *Matter of E. Hampton Sand & Gravel Co., Inc.*, 25 B.R. 193, 199 (Bankr. E.D.N.Y. 1982), to wit:

> The lease is part and parcel of one unified transaction whereby the creditor sold its concrete manufacturing business to the debtor. The documents were executed simultaneously and are replete with language indicating that default on the note would be considered a default on the lease, and that they could only be assigned in tandem. It is clear that payment on the note was a principal element of the overall agreement, and that it was a major consideration in effectuating the lease of the premises. Severance of the note from the lease would deny the creditor the benefit of his bargain and would result in an unjust windfall for the debtor.

Thus, in this instance, the Debtor cannot assume the Lease without its cure payment also including the amount due under the Note ($214,642.21 as of the Petition Date). As discussed below, the Debtor has

7

not demonstrated the financial wherewithal to either: (1) pay the administrative rent; or (2) make even the existing proposed cure payment of $17,776.16 per month on top of its post-petition monthly rent. Adding a cure of the Note adds another $17,886.85 per month (being $214,642.21 divided by 12) would render the Plan even less feasible.

### (b)     *Plan Payments are not Feasible*

With respect to Landlord, the Plan proposes to make the following payments: (1) Landlord's administrative expense claim for Rent accrued during the case (currently $213,846.27) will be paid prior to the Effective Date (Article IV, Section A.); (2) the pre-petition Rent arrearage ($213,314.00) will be paid over 12 months following the Effective Date (Article VI, Section A(a).);[1] and (3) Landlord's Note claim will be paid as a general unsecured claim, pro rata with other such claims, at the rate of $24,150.57 per quarter over 3 years (Article V, Section B.1.). Of course, Debtor also needs to continue to make on-going post-confirmation rent payments to Landlord as well.

However, at last report, the Debtor had $2,253.99 cash on hand. *See July Monthly Operating Report* [Doc. No. 52]. The Debtor's financial projections indicate revenue of $1,465,000 per year. *See Plan*, Exhibit A. That amount is highly suspect as the July Monthly Operating Report [Doc. No. 52] indicates revenue of only $65,885.69. Annualizing that amount yields $790,628.28 – a far cry from $1.465 million. Nonetheless, even assuming the Debtor's projected revenue is achievable, that revenue is $122,083 per month. Adding the Debtor's cash on hand gives it about $125,000 to pay its obligations for the first month of the Plan. That does not

---

[1] Landlord is not objecting to the cure payment being made over 12 months, but merely that even in doing so, the Plan is not feasible. *In re Citrus Tower Blvd. Imaging Ctr., LLC*, 2012 WL 1820814, at *4 (Bankr. N.D. Ga. Apr. 2, 2012) ("Generally, a time period of one year or less has been construed as satisfying the requirement of prompt payment of the cure amount with a lease that has significant time remaining on its term.").

even pay *half* of what is due to Landlord alone in the first month of the plan for past-due rent, let alone the Debtor's other obligations, inclusive of rent for the first month post-confirmation.

Even more simplistically, the Plan proposes to make quarterly payments to unsecured creditors in the amount of $24,150.57 per quarter, being $96,602.28 per year. However, the Debtor's own plan projections indicate net income for the first year of the Plan, before paying unsecured creditors, of just $4,926. They are nearly $92,000 short of their own plan payments.

The Debtor's own financial statements and projections show that it cannot make its Plan payments, thus it is apparent that the Plan is not feasible under Section 1129(a)(11) of the Bankruptcy Code.

## Conclusion

The Debtor seeks to confirm a Plan that is not feasible and achieves no material purposes other than to prejudice Landlord. For the reasons stated above, the Plan cannot be confirmed as it does not comply with 11 U.S.C. §§ 1129(a)(3) and 1129(a)(11). Accordingly, the Court should deny confirmation.

WHEREFORE, Seminole and Patch, LLC, Seminole and Patch II, LLC, and Harbor RDC Storage, LLC, respectfully request the entry of an Order denying confirmation of the Debtor's Subchapter V Plan of Reorganization and granting such other and further relief as may be just and proper under the circumstances.

> */s/ Michael S. Provenzale*
> Michael S. Provenzale
> Fla Bar. No. 0056834
> LOWNDES, DROSDICK, DOSTER,
> KANTOR & REED, P.A.
> 215 N. Eola Drive
> Orlando, Florida 32801
> Telephone: 407-843-4600
> Facsimile: 407-843-4444
> E-mail: michael.provenzale@lowndes-law.com

*Counsel for Seminole and Patch, LLC, Seminole and Patch II, LLC, and Harbor RDC Storage, LLC*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 11, 2025 I electronically filed the foregoing with the Clerk of Court by using the Case Management/Electronic Case Filing ("CM/ECF") system which will send a notice of electronic filing, and I will complete service of the foregoing as required by Rule 5, Federal Rules of Civil Procedure, made applicable by Rule 7005, *Federal Rules of Bankruptcy Procedure*, to all parties indicated on the electronic filing receipt, and to the Debtor at: BMI Smart Parking Lots LLC, 5282 Patch Rd., Orlando, FL 32822.

*/s/ Michael S. Provenzale*
Michael S. Provenzale